UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| KIRK DEPHILIPPO, SR., | ) |
| | ) |
|    Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Civ. No. 09-609-B-W |
| WARDEN, MAINE STATE PRISON, | ) |
| | ) |
|    Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Kirk Dephilippo, Sr.[1] has filed this timely 28 U.S.C § 2254 petition presenting four claims for federal habeas review. Dephilippo was convicted of robbery and aggravated assault charges stemming from accusations of a store security manager, David Wunder, that Dephilippo stole jeans from the JC Penney store in Bangor, Maine. Dephilippo was in the store with Tara Madore and Ty LaVasseur and the trio was caught on store surveillance video during part of this occurrence. Dephilippo's defense at trial was essentially that he was so much under the influence of drugs and alcohol he could not remember anything about being at the Bangor Mall that day except being grabbed at some point during this substance-induced blackout. In addition to Dephilippo taking the stand in his own defense, Doctor John Hale testified with respect to Dephilippo's history of substance abuse in support of the defense's impairment theory. The jury deliberated for sixty-nine minutes before returning a guilty verdict. The State of Maine has filed an answer to the 28 U.S.C. § 2254 petition accompanied by the state court record. I now recommend that the Court deny Dephilippo § 2254 relief.

---

[1]     In the state court transcripts and decisions by the Maine Law Court his name appears as "DePhilippo." However, it is clear from his own pleadings that there is no capitalization of the first "p.'

*Discussion*

**Parameters of 28 U.S.C. § 2254 Review**

This court will not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the Maine court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The Maine courts' factual findings "shall be presumed to be correct" and Dephilippo bears the burden of disproving these factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). See also O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir.2009); McCambridge v. Hall, 303 F.3d 24, 34-35 (1st Cir. 2002).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

Congress has provided that there is a gate-keeping exhaustion of state-law remedies requirement with regards to federal habeas claims of state court determinations. See 28 U.S. C. § 2254(b)(1)(A). Furthermore: "To provide the State with the necessary 'opportunity,'" to review his or her claims "the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court

to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citation omitted); see also Pike v. Guarino, 492 F.3d 61, 71 (1st Cir. 2007); Jackson v. Coalter, 337 F.3d 74, 85-87 (1st Cir. 2003).

With respect to the State's burden, in order for the state decision to be accorded § 2254(d) deference, the state court must have adjudicated the federal claim on the merits. See Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010) ( "A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.' Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir.2007)."). Although the Maine Law Court's determination denying the certificate of probable cause is brevis, it "was neither a disposition on procedural grounds nor a summary disposition in which the court simply remained silent on the issue[s]." Id. at 53.

**Section 2254 Claims**

*Due Process/Access to Court Claim Concerning the Post-Conviction Proceedings*

In his first 28 U.S.C. § 2254 ground Dephilippo maintains that his Fourteenth Amendment right to due process and his First Amendment right to access to the Court were infringed. This is the only claim the state contends is not exhausted under Baldwin. It maintains that Dephilippo framed the challenge as an abuse of discretion concern and not a violation of the United States Constitution. Dephilippo's counseled brief seeking review from the Maine Law Court of the denial of post-conviction relief, written by his post-conviction counsel, did not raise this claim. In his pro se memorandum in support of his petition for a certificate of probable cause, Dephilippo framed this issue as: "Whether it was an abuse of discretion by the [post-conviction] Court not to allow a short enlargement of time to allow the Defendant the ability to

3

properly prepare for the evidentiary hearing." (Doc. No. 1-2 at 4.) In that pleading he explained that his incarceration in Rhode Island "caused a separation from his family and his legal paperwork." (Id. at 5.) He lamented: "To cause the Defendant to testify to issues that occurred over two years prior (at the time of the hearing) with only his memory was unreasonable and caused testimony to be uncertain and erroneous in violation of the Defendant's constitutional[ly] protected rights." (Id.) (emphasis added). The Maine Law Court, in denying Dephilippo a certificate of probable cause, regurgitated this claim as being one premised solely on an abuse of discretion. (Order Denying Certificate Probable Cause at 1, State App. D.) It denied all of his claims on the basis of its opinion that no further review was necessary. (Id.) Under these circumstances I consider the claim exhausted and conclude that Dephilippo is entitled to de novo 28 U.S.C. § 2254 review. See Porter v. McCollumn, __ U.S. __, __, 130 S. Ct. 447, 452 (2009).

There is a circuit split as to whether or not some sort of infirmity in a state's post-conviction process can be grounds for a 28 U.S.C. § 2254 claim. See e.g., Weiland v. Parratt, 530 F.2d 1284, 1288 (8th Cir 1976) ("A state has no constitutional duty to provide post conviction remedies or hearings, and the only effect of a state's failure to do so is to enable a person convicted in the state courts to bring his federal constitutional claims directly to the federal courts as petitioner has done. And the defendant has had the benefit of the district court's independent evaluation of his claims."). However, the First Circuit has found this type of challenge cognizable. See Dickerson v. Walsh, 750 F.2d 150, 152 -54 (1st Cir. 1984); Dechaine v. Warden, No. 00-123-P-H, 2000 WL 1183165, 19 n. 9 (D. Me. July 28, 2000) (recommended decision) ("The First Circuit has declined to join the growing number of courts that have held that errors and defects in state post-conviction review proceedings are not *per se* cognizable on federal habeas-corpus review.").

4

Assuming that this is a cognizable 28 U.S.C. § 2254 claim and that Dephilippo adequately articulated it as a constitutional challenge, there is no dispute that the post-conviction justice gave Dephilippo an opportunity to elaborate his case in a post-hearing brief.  It is basically Dephilippo's contention that his post-conviction attorney was responsible for not following through with this invitation by presenting the relevant supplementation to the post-conviction court:  "Because the petitioner was represented by counsel and it was the duty and responsibility of counsel to submit the memorandum the petitioner not only believed but was also assured by counsel that the memorandum would be done.  Counsel failed to prepare and file a memorandum much to the petitioner['s] surprise then was inform[ed] again to his surprise that he was order[ed] personally to prepare and file the memorandum." (Reply Mem. at 4.)

During the post-conviction hearing, the court took a recess so that counsel could confer with his client to assure that they had addressed every claim in the two post-conviction motions. (Post-conviction Hr'g Tr. at 36-37.)  Dephilippo indicated that they had covered all his grounds. (Id. at 37.)  Counsel articulated Dephilippo's desire to submit his "own Memorandum" after he received his 20 pounds of paperwork at the Maine State Prison.  (Id. at 37-38.)  Post-conviction counsel clearly represented that the proposed additional memorandum would be authored by Dephilippo, assuring the court that his previous pro se submissions had been "eloquently written."  (Id. at 38-39.)  And, most damaging to Dephilippo's current assertion that he expected counsel to submit this memorandum for him, Dephilippo indicated that he would try "to get it done in 30 days.  If I get 45, it would be better." (Id. at 39.)  Acceding to the forty-five day timeframe, the court suggested that Dephilippo should send a draft to post-conviction counsel for his review.  (Id. at 39.)   Before the close of that proceeding the Court clearly indicated that Dephilippo's deadline for this submission was July 11, 2008. (Id. at 52.)

5

In the order and judgment by the Superior Court the justice prefaced his discussion with the following paragraph: "Pursuant to M.R. Crim. 73, the court authorized the parties to submit post-hearing briefs, beginning with Petitioner. However, as of the beginning of October, the court has received no brief from Petitioner, and therefore concludes that the post-trial briefing opportunity has been waived." (Post-conviction Order and J. at 1, State App. C.) And, before embarking on an analysis of Dephilippo's ineffective assistance of counsel claims, the court explained:

> The hearing was scheduled for May 22, 2008. On the day of the scheduled hearing, Petitioner filed a motion to continue, dated the day before, claiming that certain notes he had prepared had been delayed in shipment from the out-of-state correctional facility at which he had been held back to Maine. The State objected.
> In response, Petitioner did not establish that his notes would have added anything to the two-page list of points his counsel had already submitted. Also, it appeared that Petitioner had not arranged for his notes to be shipped to Maine in a timely manner. The fact that the continuance was requested on the day of hearing also weighed against the request. For these reasons, the Court in its discretion denied the motion to continue and directed that the hearing proceed.

(Id. at 3.) In a footnote to this explanation, the court observed: "It might also be noted that the Petitioner was given leave to submit a post-hearing brief in which he presumably could have made the points that are reflected in the notes, but has not submitted any such brief. His failure to do so confirms the appropriateness of the denial of the continuance in the court's view." (Id. at 3 n. 2.) It is clear from the record that the post-conviction court was very conscientious vis-à-vis Dephilippo's request to review his files to discern if there was a basis for further development of his post-conviction arguments.

Even if post-conviction counsel is somehow responsible for Dephilippo's failure to take the opportunity to provide his memorandum, Congress has made it clear that ineffective assistance of post-conviction counsel is not grounds for 28 U.S.C. § 2254 relief. 28 U.S.C.

6

§ 2254(i)("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). I conclude that Dephilippo had an adequate opportunity to present his arguments to the post-conviction court and that he does not make out a Fourteenth Amendment due process or First Amendment access to the court claim in relation to the post-conviction hearing.

*Ineffective Assistance Claims*

With respect to the ineffective assistance of counsel claims, the post-conviction court directly cited Strickland v. Washington, 466 U.S. 668 (1984) as applying to these claims. Therefore, there is no question that in relation to the ineffective assistance challenges the state court identified Dephilippo's federal constitutional claim and that its decision is entitled to "AEDPA's heightened deference." Clements v. Clarke, 592 F.3d 45,54 (1st Cir. 2010); see also Gray v. Brady, 592 F.3d 296, 301-02 (1st Cir. 2010).

"To prevail," on his Sixth Amendment claims premised on the Strickland v. Washington, 466 U.S. 668 (1984) standard, Dephilippo "must show both that 'counsel's representation fell below an objective standard of reasonableness,' Strickland, 466 U.S., at 688, and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' id., at 694." Smith v. Spisak, __ U.S. __, __, 130 S. Ct. 676, 685 (2010). Although Dephilippo "must prove both deficient performance and prejudice to prevail on his ineffective assistance of counsel claim, a reviewing court need not address both requirements if the evidence as to either is lacking. As the Supreme Court has recognized, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007) (quoting Strickland, 466 U.S. at 697).

7

### *Failure to Prepare Dephilippo for his Testimony*

I address Dephilippo's fourth § 2254 claim ahead of his remaining two ineffective assistance challenges because the discussion provides a great deal of factual detail that helps contextualize the other claims.

At the trial, the testimony on direct examination of Dephilippo established that he was forty-one, divorced, and the father of three kids. Counsel then proceeded:

> Q. Now, sir, have you had some issues regarding alcohol and drug use?
> A. All my life.
> Q. And when you say all your life, what are you talking about?
> A. Since I was about five years old.
> Q. And what have those issues been?
> A. Drinking, I.V. use, cocaine, heroin, oxycontin.
> Q. When did you start drinking, sir?
> A. When I was five.
> Q. When did you start using any kind of illegal, unprescribed drug?
> A. Twelve or thirteen.
> Q. And what did you start with?
> A. Cocaine, heroin, acid, marijuana.
> Q. How frequently, sir, when you became an adult after you turned eighteen, were you using alcohol?
> A. All the time, every day.
> Q. How about drugs?
> A. As much as I could get them, when I had the money.

(Trial Tr. at 198-99, State App. A.) With respect to his relevant interactions with Tara Madore and Ty LaVasseur, Dephilippo's testimony was as follows:

> Q. And did you [three] actually stay together for a period of time?
> A. Yes, we did, in a motel room.
> Q. And how long did you stay together in a motel room?
> A. Four or five days.
> Q. What were you doing – Well, first of all, do you remember what motel?
> A. Motel 6.
> Q. What were you doing during those four or five days?
> A. Drugs, drinking.
> Q. What kind of drugs?
> A. Heroin, cocaine
> Q. Where did you get the heroin and cocaine from?

8

> A. From the money that [Madore] took from some people that she was caring for on her last job.
> ….
> Q. Did you and Ty have any money to contribute to that?
> A. No money.
> Q. Were you, at that point, working?
> A. Not at that point, no.
> ….
> Q. …Do you recall, at some point, going to the Bangor Mall on February 18th?
> A. I don't recall – I don't recall going to the Bangor Mall.
> Q. You've been sitting through this trial and you've seen documents and – and photographs and so on. Is that correct?
> A. Yes, that's correct.
> Q. Do you have any doubt that you were at the Bangor Mall sometime around 4:00 O'clock on the 18th?
> A. Not by the transcripts, no, I have no doubt.
> Q. Now, sir, that particular day, had you been using drugs or alcohol?
> A. Yes, I was.
> Q. Can you tell the jury what you had taken that day? [A]s you recall.
> A. Heroin, cocaine, I was drinking Jim Beam, and we was actually using I.V.s, and alcohol through an I.V., too, a syringe.
> Q. So you were shooting alcohol?
> A. Alcohol, too.
> Q. --into your system? Were you the only one that day?
> A. No, all three of us were.
> Q. Did you personally see Ms. Madore using drugs that day?
> A. Numerous times, yes, in that day.
> Q. And what – How did she administer those drugs to herself?
> A. I.V. use. I.V. use.[2]
> Q. Syringes?
> A. Syringes.
> Q. As you're sitting here today, sir, can you tell us how much – how much drugs you used that day?
> A. I don't recall.
> Q. Can you tell us how much alcohol you had had?
> A. I remember us buying a couple half gallons, but I'm not sure exactly how much we drank of it.
> Q. Now, sir, you've told us that you don't remember going to the Bangor Mall.
> A. No, I don't.
> Q. Do you remember anything that – that may have occurred at the mall?

---

[2] Madore testified that not one of the three had used drugs or alcohol that day. (Id. at 65-66.)

9

> A. I remember being confronted by a man. That was it. Came from behind me, grabbed me.
> Q. Can you tell us what you remember about that?
> A. I can just remember a guy grabbing my neck, and I can't remember nothing after that.
> Q. Do you remember having a fight, a physical fight, with anyone?
> A. An altercation? No. I just remember being grabbed.
> Q. Do you remember being at JC Penney's and taking jeans?
> A. No, I don't.
> Q. Do you remember getting into a vehicle and driving away from the Bangor Mall?
> A. No, ma'am, I don't.
> Q. Can you tell me, sir, what's the next thing that you remember after – You say you remember being grabbed by someone and having some kind of an altercation. What is the next thing that you – you can consciously remember now?
> A. I can't recall.
> Q. Do you remember whether you went back to the motel with Tara and Ty.
> A. Well, I don't believe we did.
> Q. Can you remember anything about where you did go?
> A. No.
> Q. Do you remember who it was that grabbed you?
> A. No.
> Q. Do you recall even seeing that person?
> A. No.

(Id. at 200 – 205.)

On cross-examination Dephilippo continued to maintain that he had no memory of the events at the mall although he did specifically recall what he did in terms of drug usage at the motel on the day of the incident. However, Dephilippo professed that he remembered never taking any jeans from J.C. Penney's in spite of what he heard during the course of the trial. (Id. at 207-13.)

At his post-conviction hearing, Dephilippo indicated that he was taken by surprise when his attorney called him to testify before his expert, Dr. Hale, testified. "She called me up," Dephilippo explained, "And I was, like, shocked because the jury is sitting there and I come up –

Even if she did, she never prepared me. Regardless, I was never prepared." (Post-Conviction Hrg. Tr. at 16-17.) At this hearing, the following exchange then took place:

> Q. Okay, Can I ask you what was the defense to this case?
> A. It was supposed to be intoxication and mental abnormality. I didn't hear much of it come into play.
> Q. Okay. Is that why she hired Dr. Hale?
> A. I think so, yes.
> Q. Okay. Anything else about your prep time to get you prepped to testify that you wanted to add?
> A. There was no prep time. I only seen [counsel] twice and when we had trial that was it and a little bit through correspondence.
> Q. Okay. Anything else you want to add if you were not prepared?
> …
> A. I never – we never even talked about me testifying.

(Id. at 17.) Later in this post-conviction proceeding Dephilippo also faulted counsel for not doing rebuttal questioning. (Id. at 23.) He opined: "I remember she called me up, I'm pretty sure, then the State talked to me and she had no further questions. No rebuttal from her." (Id. at 24.)[3]

During the State's examination of Dephilippo at the post-conviction hearing there were the following questions and answers related to his trial testimony:

> Q. Now, regarding the decision whether you should testify or not, do you recall having any discussions about need for your testimony with [your trial attorney] prior to trial?
> A. We really never discussed that.
> Q. Do you recall that during the trial she filed and argued a motion in limine to keep your record out should you testify?
> A. I think I remember her filing that.
> …
> But I know – I know I just wouldn't want to get on the stand with my record, that's why I wouldn't even want to get on there. If she would have come out and asked me in the beginning, I would have said no, no, no.
> Q. Mr. Dephilippo, do you recall that shortly before you did testify there was a hearing – the record reflects that you were present in the courtroom – at which

---

[3] Dephilippo acknowledged that the prosecutor's question was "blunt and damaging." (Id.)

  point Justice Hjelm indicated that he was not going to let your record in to be testified.
  A. I do remember that.
  Q. And is it fair to say there wouldn't be any reason to even have that discussion if you weren't going to testify?
  A. I just didn't want to incriminate myself.

(Id. at 44-45.)

The post-conviction court found on this score:

> [Dephilippo's] claim that his former counsel called him to testify without any warning is belied by the trial transcript, which indicates that, in Defendant's presence before he was called, his attorney sought to exclude evidence of his prior convictions for impeachment purposes, and the court heard oral argument on whether certain prior convictions would be admissible to impeach him during his testimony, Trial Transcript vol. I, pp 127-32. Thus, Defendant plainly was not called upon to testify with no warning. According to the transcript, before testifying he sat and listened while the attorneys and the Court discussed what could be raised during his testimony on cross-examination.

(Post-conviction Order and J. at 6.) It further adduced:

> Petitioner's claim that trial counsel failed to prepare him to testify at trial was not supported. Also there is nothing to indicate that further preparation would have made any substantive difference – at trial Petitioner testified to a pervasive inability to recall anything about the incident giving rise to the charges, or even being at the mall where the incident occurred, except that he did recall being grabbed by the neck by some unknown person. … Thus, Petitioner did not establish how further preparation could have affected his testimony or the way the jury perceived his testimony.

(Id. at 8.) [4]

---

[4]  At the post-conviction hearing Dephilippo also describes a conversation he had with another witness, Brent Cunningham (who did not testify) in the parking lot that evening. (Id. at 20.) During the post-conviction hearing Dephilippo was challenged on his new ability to remember more details of the events in the mall and the parking lot:
  Q. You believe Mr. Cunningham could have assisted because of the conversation to recall having …with him outside the store?
  A.. Yes. Well he said he see the whole incident.
  …
  Q. …I'm asking, do you recall having an encounter with Brent Cunningham?
  A. Yes, he said, what did you do with that man's wallet? And I go, I never stole a wallet.
  Q. And you recall – is that included in the police report?
  A. No, it's not.
  Q. But you recall that?

12

It is clear that to the extent that Dephilippo had a tenable claim vis-à-vis a lack of testimony preparation he did not develop the facts for such a claim in his post-conviction proceeding.  See 28 U.S.C. § 2254(e).  He is not claiming that his attorney counseled him to falsely testify to a lack of memory and it is hard to imagine, as a consequence, how any preparation would have changed his testimony whereby he swore an oath that he had no memory of these events.  As for his assertion that he was taken off guard by the decision to call him to testify, there is no question the post-conviction court's assessment of that aspect of this Strickland  ground survives the deferential review standard of 28 U.S.C. § 2254(d)(2).  What is more, counsel did effectively advocate to exclude evidence of Dephilippo's prior convictions.  Had he not taken the stand it is hard to see how there would have been any basis for a defense verdict at all.  Dr. Hall's testimony was generalized and certainly not adequate in itself to warrant an acquittal given Wunder's and Madore's version and the other testimony about the events at the mall that evening.

---

    A.    I do recall that because he never mention about no pants either.
    Q.    Are [y]ou talking about from the police reports or when he talked to you?
    A.    No, from the police reports.
    Q.    And you recall him being present when you exited near the doors …by Ruby Tuesday's?
    A.    Yes, he said he seen the whole incident.  I were out by Ruby Tuesday's.
    Q.    Do you recall going out the door?
    A.    Yes.
    Q.    Mr. Dephilippo, have you had a chance to review the transcript of your testimony at trial?
    A.    Back when, I did.  Years ago, I did.
    Q.    Okay.  Do you recall that at trial you testified that you had no recollection of being in the mall?
    A.    I don't remember.  I can't remember right now.  Like I said, I'd have to go through it all.
    Q.    Do you recall at trial testifying your only recollection – you recall that you testified at trial that you were using drugs heavily –
    A.    Yes.
    Q.    -- that day. In support of your alcohol defense, your intoxication defense?
    A.    Yes,
    Q.    Do you recall indicating that the only recollection you had of events that day were being grabbed by somebody?
    A.    I may have, but, like I said, without my notes, then, I don't recall.
(Post-conviction Hr'g Tr. at 48-50.)

### *Ineffective Assistance Failure to Properly Cross-Examine Witnesses and Challenge use of Photos is Lieu of Video*

Dephilippo asserts in his 28 U.S.C. § 2254 motion that trial counsel did not properly prepare for the cross-examination of certain witnesses for impeachment purposes. (Sec. § 2254 Pet. at 7.) He specifies only two witnesses in this § 2254 pleading who, according to him, gave inconsistent statements: Carine Harris, a visitor to the mall at the time in question, and the victim, Mr. Wunder. (Id.; Trial Tr. at 137-53.) I could locate no reference to Carine Harris in Dephilippo's post-conviction pleadings or the hearing transcript and conclude that this aspect of his second § 2254 ground is not exhausted.

With respect to the testimony of Mr. Wunder, Dephilippo contends that the injuries Wunder sustained were a consequence of his unannounced assault on Dephilippo from behind. (Sec. 2254 Pet. at 7-8.) Dephilippo makes no further reference to this ground in his reply.[5] I could not locate any part of the post-conviction hearing transcript that articulated a claim against counsel for not effectively cross-examining Wunder. In his counseled motion to the Maine Law Court seeking review of the denial of post-conviction relief, Dephilippo argued that his trial attorney did not "pursue effective questioning" of Wunder. (Mem. Support Certificate Probable Cause at 3, State App. D.) This pleading stated: "Mr. W[u]nder, whose injury was the basis of the assault charge, initiated the contact when without warning he approached the petitioner from behind and without identifying himself, grabbed the petitioner around the neck.

---

[5] During the post-conviction hearing Dephilippo addressed the testimony of Tara Madore and what he viewed as inconsistent statements. (Post-conviction Hrg. Tr. at 17-19.) Madore, who testified at trial that she saw him steal the pants and hurt Mr. Wunder, was not "in the vicinity," according to Dephilippo, as she was headed out the exit. (Id. at 18.) At this hearing, inconsistent with Dephilippo's trial transcript of an almost complete lack of memory of the events, he testified to his recollection that the mall was "fairly full of people at the time" if he "remember[ed] right" and he was skeptical that Madore could have witnessed the assault on Wunder. (Id. at 18-19.) At the post-conviction hearing he did not explain how counsel could have impeached Madore on this score. At any rate, Dephilippo does not raise this Madore claim in his § 2254 pleadings.

14

(Tr. 23:1-12)." (Id. at 4.) The cited portion of the post-conviction transcript does not articulate how trial counsel could have more effectively cross-examined Wunder; it merely is Dephilippo's version of how Wunder grabbed him from behind by the neck and he reacted as a consequence. In Dephilippo's pro se memorandum in support of a certificate of probable cause he explained:

> At trial, Mr. Wunder gave contradictory testimony which established the photo being used did not show … Mr. Dephilippo taking the merchandise. (T. Tr. 43.) Mr. Dephilippo repeatedly requested that his Court-appointed counsel bring forth the surveillance camera video not only to establish that he did not take any pants but also that Mr. Wunder came up behind Mr. Dephilippo and grabbed him around the throat without warning. (T. Tr. 89, 180, 202-204).

(Pro Se Mem. Support Certificate Probable Cause at 1-2, State App. D.) Thus, any substance this ground really has melds into Dephilippo's third § 2254 claim discussed directly below.

It is Dephilippo's belief that counsel fell short of the Sixth Amendment standard when she failed to seek suppression of "various prejudicial evidence." (Sec. 2255 Pet. at 8.) He again stresses that there was a video of the events available but the State was allowed to introduce still pictures, without the proper foundation being established through showing the video. (Id.) In his memorandum in response to the State's answer, Dephilippo maintains that "the still photographs were allowed to be used d[e]spite the fact that no foundation was established by the use of the store surveillance camera tape." (Pet'r Obj. at 1, Doc. No. 9.) He makes a 'best evidence' argument. (Id. at 2.) "It is clearly establish[ed]" Dephilippo asserts, "that if the State wanted to bring this video into evidence they would have been allowed to." (Id.) He insists:

> It is clear this evidence was withheld because it would have proven the petitioner to be innocent of the charge of aggravated assault and would not have establish[ed] any of the elements of either crime charged. Therefore for this one issue in and by itself this court should deny the motion to dismiss and allow a hearing if for no other reason th[a]n to view this surveillance camera video.

(Id. at 2-3.)

15

Dephilippo challenged counsel's failure to use the JC Penney videos and to seek videos from the mall and other stores at his post-conviction hearing. With respect to the notion of the motion to suppress, he testified:

> Q. Okay. Now, you mention failed to file motions to suppress prejudicial evidence. What evidence did you feel is prejudicial, and what motions did you want her to file that she didn't?
> A. The security of the store. She did not file – I wanted her to –I also asked her to h[ire] a private investigator, which she never did, to do an investigation also.
> Q. Okay. Well as far as a motion to suppress, do you have any specific motions that you really felt that she should have filed in your case?
> A. As far as witnesses?
> Q. No, prejudicial evidence. You indicate your—
> A. Picture from the cameras.
> Q. You wanted motions to suppress?
> A. Yes.
> Q. And what did you believe the basis to suppress the pictures would have been?
> A. It doesn't show me stealing.
> Q. Okay. So basically felt it was more prejudicial and it is prejudicial as opposed to hopeful?
> A. Yes.
> Q. Okay. Misleading, so to speak?
> A. Misleading,
> Q. You felt that those pictures should have not come into evidence because they weren't helpful?
> A. That's true.
> Q. Okay. That is, you wanted to add on your claim that she failed to file a motion to suppress prejudicial evidence? …
> A.  I got none of my notes.
> Q. Okay.
> A. Offhand, I can't really think right off.

(Post-conviction Hrg. Tr. at 10-11, State App. at C.)

 Apropos the videos, Dephilippo explained upon questioning by the State:

> Q. And can you tell us what actually occurred that you think the video had showed differently [than Mr. Wunder's description]?
> A. I didn't put no pants under my shirt.
> Q. You're sure of that?
> A. Positive.

16

> Q. All right. And Mr. Wunder then indicates that he follows you out of the store and there's nothing more that actually happened in the store. Do you recall that?
> A. I think I recall that.
> Q. So there's nothing else on the JC Penney surveillance video that would impact upon what subsequently happens outside other than the issue of whether or not you took the pants?
> A. The incident that took place.
> Q. That's outside the store?
> A. Yeah, right. Inside, I don't believe, no.
> Q. So regarding the initial theft, it's your testimony here that you did not take anything from JC Penney.
> A. That's true.
> Q. You recall that specifically?
> A. Specifically, I do.
> Q. Okay.
> A. I know they said they had, like so many different cameras and I remember at trial they had so many different cameras positioned in different ways. I vaguely remember that, too.
> Q. I'm not concerned with what the camera saw, what the police reports say.
> A. All right.
> Q. I am concerned what Kirk Dephilippo has to tell us today. Are you telling us that you remember you did not take any pants?
> A. I didn't take no pants.
> Q. Now you wanted her to look for a video outside in the general mall area. Do you know whether that video exists?
> A. No, that's what I'm asking if -- I'm pretty sure mall has security camera, plus there's other stores that were right there, I'm pretty sure they did, too.
> Q. All right. Can you tell us what happened in that area that you think that video might show?
> A. It shows me trying to get away when somebody grabbed me from behind.
> Q. Tell us what happened, what you recall?
> A. What I recall? I recall someone grabbing me. Then I started to run, and I remember somebody coming in front of me and he grabbed me again and we wrestled around and I fell upon him. And then I got up and started to run again because I still had no idea – he never said nothing, who he was or nothing.
> Q. And that's the evidence that you would hope to find on the mall security?
> A. Yes.

(Post-conviction Hr'g Tr. at 46-48.)

Dephilippo has not provided the court with the video he thinks is so exculpatory. The State suggests that the full video from the JC Penney camera(s) would have been more

17

incriminating than the still photos.  This conclusion is supported by the transcript of Wunder's cross-examination concerning the photos:

> Q. And do you know which picture was taken by what camera?
> A. It would be hard to tell.  It doesn't say which camera number on – on the screen.
> Q. Did you, yourself, pick out which still photographs to provide here today?
> A. No ma'm.
> Q. Do you know who did?
> A. No, I don't.
> Q. Okay.  Now, is the entire tape available?
> A. Yes it is.
> ….
> Q. Sir, could you tell me, please, do any of those photographs actually – can you actually see Mr. Dephilippo putting jeans up his shirt?
> A. Yes, Ma'm.
> Q. Which one, sir?
> A. This one, you can tell he's – where he starts to bend over to –
> … Move them up.
> Q. I can see that he's bending over, sir, but can you actually see jeans in that?
> A. I guess not in these actual photos, no, but by the video, I can.
> Q. Okay.  But in none of these photographs that we have introduced can you see jeans being put up a shirt.
> A. Not in these photos, no.

(Trial Tr. at 41-43.)

The order and judgment of the superior court addressed Dephilippo's contention on this issue as follows:

> There is no indication that any motion to suppress the State's evidence consisting of still photographs taken off a store security camera would have stood any substantial chance of success.  Petitioner had no expectation of privacy, given that the crime occurred in a shopping mall, and the court discerns no plausible basis on which the evidence at issue could have been suppressed or excluded.
> Petitioner's claims that his counsel should have investigated the existence of other, potentially exculpatory videotapes of the incident fails because Petitioner admitted he has no evidence that any such videotapes ever existed.

18

(Post-conviction Order and J. at 5.)[6]

Filing a motion to suppress the still photos would have been frivolous and Dephilippo's incomprehensible articulation of his reasons for such a motion during the post-conviction hearing is strong proof of that. There is really no reason on this record to conclude that the introduction of the actual video(s) of this event would have helped Dephilippo's defense. See Peralta v. United States, 597 F.3d 74, 82 (1st Cir. 2010) ("Trial counsel inevitably must decide where to focus his or her efforts; not every fact can be double-checked."). With respect to Dephilippo's theory that the exterior surveillance camera might have shown that Wunder grabbed him and that Dephilippo was only responding to this contact, Wunder's testimony on cross-examination was that he did grab Wunder in his attempt to retrieve the pants, albeit he said it was his arm and the neckline of his sweatshirt and not his neck with which he made contact. (Trial Tr. at 47, 50-53.) Seeking to suppress the still photos may have been detrimental to the defense given that the video may have been more damaging. Furthermore, in terms of counsel's lack of effort to find surveillance footage from other stores and the mall, it is highly conceivable that if such footage existed, it would have further incriminated Dephilippo given the testimony at trial of eyewitnesses and Dephilippo's purported lack of any real recollection of what actually occurred.

### *Conclusion*

For the reasons stated above, I recommend that the Court deny Dephilippo 28 U.S.C. § 2254 relief. I further recommend that a certificate of appealability should not issue in the event

---

[6] In his counseled brief to the Maine Law Court seeking review of the denial of post-conviction relief, Dephilippo faulted counsel for not insisting on the admission of the entire video tape(s) from JC Penney cameras and for not investigating whether there were surveillance tapes from other stores showing the incident. (Mem. Support Pet. Certificate Probable Cause at 4, State App. D.) With respect to the prospect of excluding the still photos, counsel argued that there was a best evidence infirmity. (Id.)

Dephilippo files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 16, 2010.